**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CLAIRE BALANI, address omitted per LCvR 5.1, <br><br> LANE TO, address omitted per LCvR 5.1, <br><br> ALEXIS WRIGHT, address omitted per LCvR 5.1, <br><br><br> Plaintiffs, <br> v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY, 1200 Pennsylvania Ave, N.W., Washington, D.C. 20460 <br><br> LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency, 1200 Pennsylvania Ave, N.W., Washington, D.C. 20460, <br><br> Defendants. | Case No. 26-cv-2316 |

**COMPLAINT**

1.    Federal government employees, like all citizens, have the right to participate in public discussion and debate in their personal capacities, even when their speech is critical of the government. In June 2025, Plaintiffs exercised that right. Along with hundreds of other current and former employees of the U.S. Environmental Protection Agency ("EPA" or the "Agency"), Plaintiffs signed a letter to the EPA Administrator and Congress that opposed the Trump-Vance administration's policies.

2.    Agency officials recognized that the letter was protected speech. The director of EPA's Ethics Office wrote to colleagues that "employees are simply exercising their first

1

amendment rights to express their opinions."[1] She added that "[t]he petition states on its face that the employees are acting in their personal capacity and on their own time."[2] Another EPA attorney advised that "the agency should not take personnel actions against the employees who signed the letter" because "the letter is likely protected speech under the First Amendment."[3]

3.      Those assessments were correct. By signing the letter, Plaintiffs simply expressed their opinions as private citizens on the matters of public concern raised in the letter, such as the politicization of EPA, the erosion of science-based decisionmaking, and attacks on the career civil service. Plaintiffs signed the letter outside the workplace, on their own time, and without using agency resources. In short, Plaintiffs engaged in free speech protected by the First Amendment.

4.      Nevertheless, EPA fired them. Disregarding the advice of their own senior officials, EPA leadership retaliated against Plaintiffs for exercising their constitutional rights.

5.      Plaintiffs bring this suit to protect their First Amendment rights and seek reinstatement to their jobs at EPA, along with other remedies.

6.      Plaintiffs bring the issue to this Court because, as probationary employees, they have no right to appeal their terminations to the Merit Systems Protection Board. Plaintiffs attempted to seek relief by filing administrative complaints in the Office of Special Counsel (the "OSC" or the "Office") to challenge EPA's prohibited personnel practices, but that Office has not redressed EPA's unconstitutional conduct. After nearly seven months, Plaintiffs have received no indication of any specific steps the OSC has taken to investigate their complaints or

---

[1] Kevin Bogardus, *Zeldin Disciplined EPA Dissenters After Ethics Office Found No 'Concern'*, E&E News (Mar. 11, 2026), https://perma.cc/L5AE-G5XJ.
[2] *Id.*
[3] Kevin Bogardus, *Trump EPA punished dissenters despite 'legal risk' warning*, E&E News (Apr. 2, 2026), https://perma.cc/DFR4-MS94.

when it expects to complete its investigation. And even if the OSC found that EPA violated Plaintiffs' constitutional rights, they would not be guaranteed a remedy or a path to judicial review.

7.    All the while, Plaintiffs continue to be deprived of their First Amendment rights.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law.

9.    The Court has authority to enter a declaratory judgment and to provide injunctive relief under Rules 57 and 65 of the Federal Rules of Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers.

10.    Venue is proper in this district because Defendants reside in the District of Columbia and a substantial part of the events giving rise to the claim occurred in the District of Columbia. 28 U.S.C. § 1391(e)(1).

## PARTIES

11.    Plaintiff Claire Balani is a former EPA employee.

12.    Plaintiff Lane To is a former EPA employee.

13.    Plaintiff Alexis Wright is a former EPA employee.

14.    Defendant U.S. Environmental Protection Agency is a federal agency. Its headquarters are in Washington, D.C.

15.    Defendant Lee Zeldin is the Administrator of EPA. This suit is brought against him in his official capacity.

**STATEMENT OF FACTS**

**I.      Plaintiffs' Employment as EPA Probationary Employees**

16.      Plaintiffs began working at EPA in late 2024 and early 2025. Because they were new to the Agency, they were considered "probationary" employees, as explained further below.

17.      **Claire Balani** was a contract specialist in EPA Region 2's Office of the Regional Administrator, Mission Support Division, Contracts Management Branch. EPA Region 2 serves New Jersey, New York, Puerto Rico, the U.S. Virgin Islands and eight Tribal Nations. Balani worked in EPA Region 2's office in New York City.

18.      Balani holds a bachelor's degree in international relations and a master's degree in language and literacy. Prior to joining EPA, Balani was a senior program officer conducting programmatic oversight of federal refugee social service grants at the International Rescue Committee.

19.      Balani started her employment at EPA on November 17, 2024.

20.      As a contract specialist, Balani was responsible for assisting with procurement for EPA Region 2's Superfund program, which cleans up environmental pollutants from contaminated areas. At the time of her termination, she was undergoing intensive training and working towards a Federal Acquisition Certification in Contracting.

21.      **Lane To** was an environmental engineer in EPA Region 1's Office of the Regional Administrator, Air and Radiation Division, Air Permits, Toxics and Indoor Programs Branch. EPA Region 1 serves Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont, and ten Tribal Nations. To worked in EPA's Region 1 office in Boston.

22.      To holds a bachelor's degree in environmental engineering and a master's degree in environmental engineering. Prior to joining EPA, To was an engineer at an engineering and

environmental services firm, where they helped design wastewater treatment plants for small municipalities.

23.     To started their employment at EPA on November 17, 2024.

24.     As an environmental engineer, To was responsible for a wide range of duties related to air quality. They analyzed air quality issues in support of regulatory activities and provided technical advice to state and local agency personnel on air quality issues. Specifically, they wrote and reviewed new source permits and operating permits, which are the documents by which EPA ensures that air pollutant emissions are limited to a known and quantifiable amount, in accordance with the Clean Air Act, which is the comprehensive federal law regulating air emissions to protect public health and the environment.

25.     **Alexis Wright** was Special Advisor for Implementation in EPA's Office of the Administrator, Office of the Greenhouse Gas Reduction Fund, Zero Emission Technologies Grants Division. Wright was originally hired to work remotely for the office in Washington, D.C. After EPA implemented a return-to-office policy, Wright was assigned to work from an EPA office in Narragansett, Rhode Island.

26.     Wright holds a bachelor's degree in sociology. Prior to joining EPA, Wright worked in project development roles in the private sector, where she managed largescale public infrastructure and renewable energy projects.

27.     Wright started her employment at EPA on January 13, 2025.

28.     As Special Advisor for Implementation, Wright was responsible for advising on implementation of the Inflation Reduction Act, specifically a portfolio of governmental and nonprofit-led solar access grants. She helped to ensure that federal grant dollars were effectively deployed, monitored, and held to compliance standards.

5

**II.    Stand Up for Science's "Declaration of Dissent"**

29.    In June 2025, Plaintiffs, along with hundreds of others, signed an open letter titled "Declaration of Dissent."[4] The letter was addressed to EPA Administrator Zeldin. Copied on the letter were the U.S. Senate Committee on Environment & Public Works, the U.S. House Committee on Energy and Commerce, the U.S. House Committee on Science, Space, and Technology, and members of Congress.

30.    The letter was hosted by an organization called Stand Up for Science. Stand Up for Science describes itself as "a political activism organization dedicated to defending and advancing America's scientific ecosystem, a cornerstone of democracy, freedom, and progress."[5] According to Stand Up for Science, the organization was founded in February 2025 "in response to the Trump Administration's dismantling of our nation's premier science institutions and escalating threats to the lives and livelihoods of Americans."[6] Stand Up for Science organizes rallies around the country and also engages in messaging campaigns and grassroots organizing to support its cause.[7]

31.    Stand Up for Science has organized a series of open letters to federal government officials that are available for signature.[8] Among those other open letters are the "Katrina Declaration" addressed to members of the Federal Emergency Management Agency Review Council to oppose "the effective dissolution of FEMA";[9] the "Bethesda Declaration" addressed to the Director of the National Institutes of Health in response to "Administration policies that

---

[4] Stand Up for Science, Declaration of Dissent (June 30, 2025), https://perma.cc/8ZQ3-J89L (attached as Ex. A).
[5] Stand Up for Science, About Us (last visited June 26, 2026), https://perma.cc/U62T-B229.
[6] *Id.*
[7] *Id.*
[8] Stand Up for Science, Petitions (last visited June 26, 2026), https://perma.cc/8AV2-AXSB.
[9] Stand Up for Science, FEMA Katrina Declaration (Aug. 25, 2025), https://perma.cc/A8Y8-J4M9.

undermine the NIH mission";[10] and the "Voyager Declaration" addressed to the National Aeronautics and Space Administration interim administrator about the Trump-Vance administration's cuts to NASA programs.[11]

32.    The EPA "Declaration of Dissent", Ex. A,[12] begins: "EPA employees join in solidarity with employees across the federal government in opposing this administration's policies, including those that undermine the EPA mission of protecting human health and the environment. . . . [W]e stand together in dissent against the current administration's focus on harmful deregulation, mischaracterization of previous EPA actions, and disregard for scientific expertise."

33.    The letter proceeded to identify five specific ways in which Secretary Zeldin was "recklessly undermining the EPA mission"— "[u]ndermining public trust," "[i]gnoring scientific consensus to benefit polluters," "[r]eversing EPA's progress in America's most vulnerable communities," "[d]ismantling the Office of Research and Development," and "[p]romoting a culture of fear, forcing staff to choose between their livelihood and well-being."

34.    The letter argued that, as a whole, the Agency's actions "will not protect communities from hazardous chemicals and unsafe drinking water, but instead will increase risks to public health and safety."

35.    The letter concluded by calling on Secretary Zeldin to "correct course."

36.    The letter addressed matters of public concern such as the government's failure to protect public health.

---

[10] Stand Up for Science, Bethesda Declaration (June 9, 2025), https://perma.cc/3F2E-VMY3.
[11] Stand Up for Science, NASA Voyager Declaration (July 21, 2025), https://perma.cc/U3FC-ZRNT.
[12] *See supra* n. 4 (Ex. A).

37.    The letter expressly stated that it was being signed in employees' personal capacities. It stated: "This declaration was written and signed by EPA employees across Offices, Regions, and Labs in our personal capacity, on our own time, and without Agency resources. . . . We sign this declaration both as concerned citizens and dedicated civil servants."

### III.    Plaintiffs' Signature of the "Declaration of Dissent"

38.    Each Plaintiff signed the "Declaration of Dissent" in their personal capacity.

39.    Each Plaintiff signed the "Declaration of Dissent" on personal time outside of work hours. They signed the letter at physical locations that did not belong to EPA. They signed the letter on personal electronic devices that did not belong to EPA.

40.    **Claire Balani** signed the letter at home, outside of work hours on Wednesday, June 25, 2025, from her personal cell phone.

41.    **Lane To** signed the letter on Sunday, June 29, 2025, on their personal cell phone, outside of work hours.

42.    **Alexis Wright** signed the letter outside of work hours on Sunday, June 29, 2025, on her personal cell phone while at home.

43.    On June 30, 2025, Stand Up for Science publicly announced that it had sent the Declaration of Dissent to the EPA Administrator.[13]

44.    Soon after that, the names of Balani, To, and Wright were publicly available on the Stand Up for Science website alongside the names of other signatories. As of June 30, 2025, the website showed that there were 324 total signatories.[14] Among those signatories were "Claire

---

[13] Stand Up for Science (@standupforscience), Instagram, https://perma.cc/Y7SC-BBDX (June 30, 2025) ("BREAKING: EPA workers just dropped their Declaration of Dissent."); Mazine Joselow, *E.P.A. Workers Warn Trump Is Politicizing Their Work*, N.Y. Times (July 3, 2025), https://perma.cc/2B95-D3BB.

[14] Internet Archive Wayback Machine, June 30, 2025 screen capture, https://perma.cc/7EVV-K4AS.

Balani, Contract Specialist, Region 2"; "Lane To, Environmental Engineer"; and "A WRIGHT, Special Advisor for Implementation, OGGRF, HQ."[15]

45.     Each Plaintiff understood that the addition of their job titles to their signatures was for identification purposes, not to suggest that they signed on behalf of EPA or represented an official agency position. No reasonable person would have understood the signatures to reflect their employer's position because the Declaration of Dissent was expressly addressed to the EPA Administrator to express disagreement with the agency's policies. Moreover, the letter expressly stated that the letter was being signed "in our personal capacity, on our own time, and without Agency resources."

## IV.     EPA's Investigation of Plaintiffs' Employment

46.     Documents released by EPA under FOIA show that on July 1 and 2, 2025, the Director of EPA's Ethics Office wrote in internal emails that, upon reviewing the letter, she and her staff had concluded that "there is no ethics concern" and that "the employees [who signed the Declaration of Dissent] are simply exercising their first amendment rights to express their opinions and . . . are not intentionally misusing their federal positions to bolster their opinions." Ex. B.[16]

47.     Documents released by EPA under FOIA show that on July 2, 2025, an Assistant General Counsel in the Office of General Counsel wrote in an internal email that "there are no ethics concerns with employees signing the 'stand up for science' letter" and that "the letter is likely protected speech under the First Amendment." Ex. C.[17] He advised that "the agency should not take personnel actions against employees who signed the letter."

---

[15] *Id.*
[16] *See supra* n.1.
[17] *See supra* n.3.

48.     The same attorney reiterated his advice in an email on August 28, 2025, stating, "I do not expect any charge [of misconduct] will withstand judicial scrutiny." Ex. D. He further noted that terminated probationary employees "may . . . have a cause of action in federal court that their termination constituted illegal retaliation for their first amendment protected speech."

49.     EPA leadership ignored these assessments by their career ethics officials and career lawyers.

50.     On July 3, EPA placed 144 employees on administrative leave and opened an investigation into their decision to sign the Declaration of Dissent.[18]

51.     The investigation involved searching the signatories' work computers and email accounts, as well as directing employees to answer a survey about their use of federal resources to view and sign the letter.[19]

52.     At some point during this period, Stand Up for Science removed the list of signatories from its website.[20] But EPA officials used an internet archive tool to see the version of the Stand Up for Science webpage that includes the list of names.[21]

53.     **Claire Balani** was placed on administrative leave on July 3, 2025. She was notified that she was being placed on administrative leave through July 17, 2025 "pending an administrative investigation."

---

[18] Maxine Joselow, *E.P.A. Suspends 144 Employees After They Signed a Letter Criticizing Trump*, N.Y. Times (July 3, 2025), https://perma.cc/C2CS-CK8Y.
[19] *See* Kevin Bogardus, *Inside EPA's Hunt for Employees Who Signed the Dissent Letter*, E&E News (Oct. 30, 2025), https://perma.cc/7EPK-4726.
[20] *Id.*
[21] *Id.*

54.     On July 16, 2025, Balani received an email stating that "EPA is conducting an investigation regarding the declaration posted [on the Stand Up for Science website]." The email included a link to a survey with questions about her signing of the Declaration of Dissent.

55.     Balani received subsequent notices that her administrative leave was being extended. A July 16, 2025 notice stated that her administrative leave was being extended through August 1, 2025 "pending the Agency's inquiry into your signature on a public declaration." Subsequent notices included similar language.

56.     **Lane To** was placed on administrative leave on July 17, 2025. They were notified that they were being placed on administrative leave through July 30, 2025 "pending an administrative investigation."

57.     Also on July 17, 2025, To received an email stating that "EPA is conducting an investigation regarding the declaration posted [on the Stand Up for Science website]." The email included a link to a survey with questions about their signing of the Declaration of Dissent.

58.     To received subsequent notices that their administrative leave was being extended. A July 30, 2025 notice stated that their administrative leave was being extended through August 1, 2025 "pending the Agency's inquiry into your signature on a declaration." Subsequent notices included similar language.

59.     On September 4, 2025, To received a notice of proposed suspension signed by Travis Voyles, Associate Deputy Administrator. The notice proposed to suspend To for fourteen calendar days on the basis that To's signature of the Declaration of Dissent was conduct unbecoming of a federal employee.

11

60.     **Alexis Wright** was placed on administrative leave on July 17, 2025. She was notified that she was being placed on administrative leave through July 30, 2025 "pending an administrative investigation."

61.     Also on July 17, 2025, Wright received an email stating that "EPA is conducting an investigation regarding the declaration posted [on the Stand Up for Science website]." The email included a link to a survey with questions about her signing of the Declaration of Dissent.

62.     Wright received subsequent notices that her administrative leave was being extended. A July 30, 2025 notice stated that her administrative leave was being extended through August 15, 2025 "pending the Agency's inquiry into your signature on a public declaration." Subsequent notices included similar language.

63.     EPA officials created a spreadsheet to summarize their investigation, which was later produced in litigation at the Merit Systems Protection Board initiated by employees other than Plaintiffs here. The spreadsheet listed each employee who had signed the letter and set forth EPA's conclusions on various points, including (1) whether the employee had signed the letter using their work laptop, and (2) whether the employee's signature on the Declaration would interfere with their job.

64.     According to the spreadsheet, EPA concluded that no Plaintiff here signed the letter on a work laptop.

65.     According to the spreadsheet, EPA also concluded that the signatures did not cause interference with Plaintiffs' jobs.

## V.     EPA's Termination of Plaintiffs' Employment

66.     After EPA's investigation into their signing of the Declaration, each Plaintiff was terminated from their job.

67. **Claire Balani** was terminated on August 29, 2025. The notice of termination, signed by Vanessa Martins, Chief of Staff of EPA Region 2, stated that "I have determined that your continued employment is not in the public interest." The notice contained no explanation of how or why Martins determined that Balani's employment was "not in the public interest."

68. The Agency terminated Balani even though it concluded in its internal investigation that her signature on the letter did not interfere with her job.

69. **Lane To** was terminated on September 26, 2025. The notice of termination, signed by Mark Sanborn, Regional Administrator of EPA Region 1, stated that "I have determined that your continued employment is not in the public interest." The notice contained no explanation of how or why Sanborn determined that To's employment was "not in the public interest."

70. The Agency terminated To even though it concluded in its internal investigation that their signature on the letter did not interfere with their job.

71. **Alexis Wright** was terminated on August 29, 2025. The notice of termination, signed by Travis Boyles, Associate Deputy Administrator, stated that "I have determined that your continued employment is not in the public interest." The notice contained no explanation of how or why Boyles determined that Wright's employment was "not in the public interest."

72. The Agency terminated Wright even though it concluded in its internal investigation that her signature on the letter did not interfere with her job. The spreadsheet summarizing EPA's investigation indicates that the only interference arose from Wright's absence on administrative leave, which "increase[s] workload for other members of her team."

73.     Aside from their signatures on the letter, there was no basis for any of the Plaintiffs to be terminated. None of their termination notices stated a reason for termination, aside from the vague and unexplained reference to the "public interest."

74.     And although several hundred probationary employees at EPA were terminated in February 2025, Plaintiffs and the other probationary employees who signed the Declaration were terminated at least six months later, in August and September 2025.[22]

75.     The timeline leading up to their terminations, including placement on administrative leave following their signing of the Declaration and the agency's investigation into their signing of the Declaration, makes it clear that their signatures were the reason for their termination.

76.     There was no performance-based reason for any of the Plaintiffs to be terminated. On the contrary, each Plaintiff had been recognized by EPA as an excellent performer.

77.     **Claire Balani**'s April 2025 progress review stated that "Claire has been a great addition to the team," that she was diligent and an active participant in team discussions, and that she was an eager learner. In fact, while Balani was on administrative leave in August, she received a cash award in recognition of her performance.

78.     **Lane To** had received a cash award and a time-off bonus award to recognize them for their performance while they were on administrative leave. The spreadsheet summarizing EPA's investigation states: "Based on my observation throughout her work day activities, her performance has been professional and she presents professionally in all her interactions."

---

[22] Kevin Bogardus, *'Complete roller coaster': EPA probationary staff returns to work*, E&E News (Dec. 9, 2025), https://perma.cc/L7TN-5FPG.

79.    **Alexis Wright** had received a time-off award in recognition of her team's performance while she was on administrative leave, immediately before being terminated. The spreadsheet summarizing EPA's investigation states: "The employee does not have a disciplinary record. She is an exemplary team member and staff.  She exceeds deadlines, assists other colleagues, and generally goes above and beyond to complete her work."

80.    Moreover, the Agency's decision to select Plaintiffs for termination was not based on any assessment of potential disruption or interference with their jobs. Rather, probationary employees were terminated without regard to any such assessment. EPA targeted them knowing that they lacked the right to appeal their terminations to the Merit Systems Protection Board and thereby a path to judicial review.

81.    On the other hand, the majority of signatories—who had stronger employment protections—either received a 14-day suspension or a letter of reprimand. Indeed, more than thirty employees were assigned no discipline at all because they were union representatives, again without regard to any assessment of potential disruption or interference.

82.    When it terminated Plaintiffs, the Agency had no evidence that the dissent letter had any impact whatsoever on EPA's reputation, operations, mission, efficiency of service, or the authority of Agency leadership.

83.    Before terminating Plaintiffs and other signatories, EPA had never before disciplined any employee for expressing their views on government policy or signing an open letter.

84.    On the contrary, EPA's policies specifically protected employees' right to speak publicly when not acting as representatives of the Agency. According to the Agency's 2025 Scientific Integrity Policy: "It is the policy of the EPA to . . . [a]llow employees to express

personal views by not limiting their right to communicate with the media or the public in their personal capacities."

## VI.     Attempts to Seek Relief Through the Office of Special Counsel

85.     At the time of their terminations, each Plaintiff was within the first year of their employment with EPA. Generally, federal employees within the first one or two years of employment (depending on the nature of the employee's appointment) are known as "probationary" employees. Each Plaintiff was a probationary employee at the time of their termination.

86.     Probationary employees have no right to challenge their termination at the Merit Systems Protection Board and thus have no right to obtain judicial review of their termination through an appeal from the Board to the U.S. Court of Appeals for the Federal Circuit.

87.     For most non-probationary employees, the Civil Service Reform Act allows for administrative review of terminations. Removal from employment is an "adverse action" that is subject to the protections of 5 U.S.C. chapter 75, subchapter II. 5 U.S.C. § 7512(1). An agency may remove an employee "only for such cause as will promote the efficiency of the service." 5 U.S.C. § 7513(a). A terminated employee is "entitled to appeal to the Merit Systems Protection Board," *id.* § 7513(d) (citing *id.* § 7701), and to seek review of an adverse Board decision from the Federal Circuit, *id.* § 7703.

88.     Probationary employees do not have access to that administrative process. The definition of "employee" in chapter 75, subchapter II excludes various categories of federal employees, including probationary employees. *See* 5 U.S.C. § 7511(a)(1)(A), (C). Probationary employees thus have no statutory right of appeal to the Merit Systems Protection Board.

89.     Given their exclusion from the right to appeal to the Board, the sole administrative recourse that was even potentially available to Plaintiffs was to file a complaint

16

requesting that the Office of Special Counsel investigate a prohibited personnel practice. Prohibited personnel practices are listed in 5 U.S.C. § 2302(b). Protection against prohibited personnel practices encompasses probationary employees in the competitive or excepted service. *See* 5 U.S.C. § 2302(a)(2)(B).

90.      Federal employees (including those in probationary status) who believe they have been subject to a prohibited personnel practice may submit a complaint to the Office of Special Counsel. 5 U.S.C. § 1214(a)(1)(A). But filing a complaint with the OSC does not guarantee a path to judicial review, even for constitutional claims. Even if the OSC determines that an employee was subject to a prohibited personnel practice, there is no guarantee of a remedy and no guarantee of judicial review if no corrective action is taken.

91.      When the OSC receives any allegation of a prohibited personnel practice, it is required to investigate. *Id.* If the Office finds reasonable grounds to believe that a prohibited personnel practice has occurred, it must report the determination to the Merit Systems Protection Board, the agency involved, and the Office of Personnel Management. *Id.* § 1214(b)(2)(B). The Special Counsel's report may include recommendations for corrective action. *Id.* But there is no requirement that the employing agency accept the recommendation for corrective action. *See id.* § 1214.

92.      The OSC "may," but is not required to, petition the Merit Systems Protection Board for corrective action. *Id.* § 1214(b)(2)(B)–(C). If the employing agency does not choose to take corrective action and the OSC does not choose to seek relief from the Merit Systems Protection Board, the employee does not have their own right to seek relief from the Board.

93.      Plaintiffs' lack of administrative recourse is compounded by the Trump-Vance administration's systematic undermining of the limited protections available to them. In February

2025, President Trump fired the head of the Office of Special Counsel without cause, in disregard of the statutory for-cause removal protections provided by Congress, and installed a series of political loyalists as Acting Special Counsels. The OSC was intended to protect the rights of federal workers like Plaintiffs, but the firing of the Special Counsel has prevented it from functioning independently, as intended by Congress.

94.    For example, after President Trump fired the Special Counsel without cause, the OSC abruptly reversed its earlier determination in February 2025 that the Trump-Vance administration's mass probationary terminations likely violated numerous statutes and regulations. This reversal sent a chilling message to federal workers that the OSC was now directly controlled by the White House and would favor political expediency over the express protections granted to probationary employees by Congress.

95.    Plaintiffs nonetheless each filed complaints with the Office of Special Counsel on December 4 or 5, 2025. A complaint with the Office generally must allege a violation of 5 U.S.C. § 2302. Accordingly, Plaintiffs could not directly assert a First Amendment claim. Instead, their complaints attempted to raise a claim that they were discriminated against "on the basis of conduct which does not adversely affect the performance of the employee or applicant or the performance of others," 5 U.S.C. § 2302(b)(10), and that they were subject to a personnel action that "violates any law, rule, or regulation implementing, or directly concerning, the merit system principles," 5 U.S.C. § 2302(b)(12). They each sought "corrective action to make [them] whole for the agency's unlawful conduct, including backpay, reinstatement, consequential and compensatory damages, attorneys fees and costs, and all other remedies available by law."

96.    On December 19, 2025, an OSC investigator contacted Plaintiffs' counsel regarding the complaints.

18

97. Plaintiffs' counsel discussed the complaint with the OSC investigator via email and phone on numerous occasions, including phone calls on December 19, 2025; January 28, 2026; February 23, 2026; April 24, 2026; and May 18, 2026. With the exception of the initial call in December 2025, each of these calls was requested by Plaintiffs' counsel.

98. During the calls, the investigator indicated that OSC was investigating Plaintiffs' complaints but that he could not provide details regarding the steps taken in the investigation or a timeline for its completion. He also stated that he asked EPA to reinstate Plaintiffs while his investigation was ongoing, but the Agency refused.

99. During the call on May 18, 2026, Plaintiffs' counsel informed the OSC investigator that Plaintiffs were considering filing a lawsuit in court given the apparent lack of progress in the OSC investigation. Plaintiffs' counsel requested that OSC bring its investigation to a conclusion expeditiously.

100. As of the filing of this lawsuit, it has been nearly seven months since Plaintiffs filed their OSC complaints. Plaintiffs have received no indication from OSC of whether it intends to seek corrective action on their behalf.

## CAUSE OF ACTION

### Count I: First Amendment

101. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

102. Plaintiffs have a non-statutory right of action to seek, and federal courts have the equitable power to grant, injunctive relief for violations of federal law by federal officials.

103. The First Amendment to the U.S. Constitution protects the freedom of speech and the right to petition the government. Government employees do not give up their First Amendment rights when they take public employment.

104.    EPA terminated Plaintiffs because they signed the Declaration of Dissent.

105.    Plaintiffs' signing of the Declaration of Dissent was private citizen speech addressing matters of public concern. They spoke as private citizens because they were off-duty at the time of their speech, did not use any EPA resources in making the speech, did not speak pursuant to their official duties, and expressly stated in the Declaration that the statements were being made in their personal capacities.

106.    The matters addressed in the Declaration of Dissent, which included politicization of the agency, science policy, and policies affecting various categories of federal employees, were of significant public concern.

107.    Plaintiffs' interests in speaking about matters of public concern were not outweighed by the interests of EPA as an employer in promoting the efficiency of the public services it performs through its employees.

108.    The speech at issue did not disrupt the workplace, impede Plaintiffs' ability to do their work, or harm the mission of the Agency. The Agency had no evidence of any such disruption or harm when it decided to terminate Plaintiffs. Instead, the Agency's own investigation concluded that there was no interference with Plaintiffs' work. Nevertheless, the Agency selected Plaintiffs for termination—not based on any assessment of the impact of their conduct on the Agency, but rather because they lacked the right to appeal their terminations to the Merit Systems Protection Board.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court enter the following relief:

A.    Declare that EPA's terminations of Plaintiffs' employment violated the First Amendment.

B.      Grant injunctive relief barring Defendants, their officers, employees, and agents from enforcing or otherwise giving effect to the unlawful terminations and requiring the reinstatement of Plaintiffs to their positions with back pay.

C.      Award Plaintiffs their costs, reasonable attorney fees, and other disbursements as appropriate.

D.      Grant such other relief as the Court deems necessary, just, and proper.

Respectfully submitted,

*/s/ Jyoti Jasrasaria*
Jyoti Jasrasaria (D.C. Bar No. 1671527)
Tsuki Hoshijima (D.C. Bar No. 90043312)
Elena Goldstein (D.C. Bar No. 90034087)
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
jjasrasaria@democracyforward.org
thoshijima@democracyforward.org
egoldstein@democracyforward.org

Daniel M. Rosenthal (D.C. Bar No. 1010473)
Charlotte H. Schwartz (D.C. Bar No. 1658311)
Eric M. Essagof (D.C. Bar No. 90028304)
James & Hoffman, P.C.
1629 K Street NW, Suite 1050
Washington, DC 20006
Phone: (202) 496-0500
Fax: (202) 496-0555
dmrosenthal@jamhoff.com
chschwartz@jamhoff.com
emessagof@jamhoff.com

*Counsel for Plaintiffs*

21